## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

YOANDRY DE LA ROSA,
BENJAMIN FELIZ MATEO, and
MAXIMO GUTIERREZ,

                Plaintiffs,                      CASE NO.: 1:23-cv-23310-KMW

          v.                                  Jury Trial Demanded

SETAI HOTEL ACQUISITION LLC,

                Defendant.

_____/

### AMENDED COMPLAINT

Plaintiffs, YOANDRY DE LA ROSA, BENJAMIN FELIZ MATEO, and MAXIMO GUTIERREZ (hereafter referred to as the "Plaintiffs" collectively), by and through their undersigned counsel, hereby complain of the Defendant, SETAI HOTEL ACQUISITION LLC (hereafter referred to as "Defendant" and/or "SHA"), and in support allege as follows:

### INTRODUCTION

1.      This case involves three Hispanic parking valets who were subjected to unlawful discrimination and harassment during their employment and were unlawfully deprived of the wages owed to them by their employer.

2.      Plaintiffs seek monetary relief to redress the Defendant's unlawful employment practices in violation of 42 U.S.C. § 1981 *et seq*. ("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. ("FLSA").

### PARTIES

3.      Plaintiff, YOANDRY DE LA ROSA ("Mr. De La Rosa"), is an individual Hispanic

man, a resident of Miami-Dade County, Florida, over the age of eighteen years, and otherwise *sui juris*.

4.      Plaintiff, BENJAMIN FELIZ MATEO ("Mr. Feliz Mateo"), is an individual Hispanic man, a resident of Miami-Dade County, Florida, over the age of eighteen years, and otherwise *sui juris*.

5.      Plaintiff, MAXIMO GUTIERREZ ("Mr. Gutierrez"), is an individual Hispanic man, a resident of Miami-Dade County, Florida, over the age of eighteen years, and otherwise *sui juris*.

6.      Defendant, SETAI HOTEL ACQUISITION, LLC, is a Delaware limited liability company, authorized to do and doing business in the State of Florida, that owns, manages, exercises control over, possesses and/or operates the hotel called The Setai ("Setai"), which is located at 2001 Collins Avenue, Miami Beach, FL 33139.

7.      Plaintiffs were employed by Defendant during their respective periods of employment.

8.      The exact number of employees of Defendant is unknown, but upon information and belief, there are well more than the statutory minimum under Title VII.

9.      Defendant is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

10.     Defendant is an "employer" within the meaning of 29 U.S.C. § 203(d).

**<u>JURISDICTION AND VENUE</u>**

11.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. This action is authorized and instituted pursuant to 42 U.S.C. §§ 1981, 2000e-5 and 29 U.S.C. § 216(b).

12.     Venue is proper in this Court under 28 U.S.C. §1391 because the events giving rise to this action occurred within the jurisdiction of the United States District Court for the Southern

District of Florida.

**ADMINISTRATIVE PREREQUISITES**

13.     Plaintiffs have complied with all statutory prerequisites in order to file this action.

14.     On or about September 29, 2022, Mr. De La Rosa timely filed a Charge of Discrimination (Charge No. 510-2022-08385) against Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

15.     On or about September 29, 2022, Mr. Feliz Mateo timely filed a Charge of Discrimination (Charge No. 510-2022-08383) against Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

16.     On or about September 29, 2022, Mr. Gutierrez timely filed a Charge of Discrimination (Charge No. 510-2022-08384) against Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

17.     On or about August 24, 2023, the EEOC issued Plaintiff Mr. Feliz Mateo's Right to Sue Notice against Defendant Setai Hotel Acquisition, LLC.

18.     Plaintiff Mr. Feliz Mateo timely commenced this action within ninety (90) days of receipt of the EEOC Right to Sue Notice.

**FACTUAL ALLEGATIONS**

19.     On or about August 21, 2021, Defendant hired Mr. Feliz Mateo as a Valet Runner.

20.     On or about October 18, 2021, Defendant hired Mr. De La Rosa as a Valet Runner.

21.     On or about May 27, 2022, Defendant hired Mr. Gutierrez as a Valet Runner.

22.     At all times material, Plaintiffs were considered satisfactory employees and had a record of positive performance.

23.     The terms "valet runner" and "valet" are used interchangeably herein.

24.     As Valet Runners, Plaintiffs were responsible for parking and retrieving vehicles for the users of Setai's valet services (the "patrons" hereafter), including guests staying at the hotel and/or dining at SHA's restaurants, as well as the owners and/or tenants residing in the condominiums on the premises.

25.     From the very beginning of their respective tenures, Plaintiffs were subjected to discrimination and harassment on the basis of their Hispanic race. By means of example, Defendant unlawfully retained tips earned by the Plaintiffs, gave preferential treatment to Plaintiffs' non-Hispanic co-workers in the assignment of vehicle retrievals, denied Plaintiffs the same employment privileges afforded to their non-Hispanic co-workers, subjected Plaintiffs to harsher criticism and discipline than their non-Hispanic co-workers, and constructively discharged Plaintiffs, among others.

26.     At all times material, Edson Belfond ("Belfond") was an individual Black Haitian male, who was employed by Defendant as Valet Manager. Belfond asserted supervisory authority over Plaintiffs, including the power to hire, fire, demote, and/or promote Plaintiffs.

27.     At all times material, Belfond asserted supervisory authority over all Setai valet runners and had operational control over all Setai valet runners.

28.     At all times material, Belfond's primary duty was the management of Defendant's business and the management of Defendant's valet service.

### **Defendant Unlawfully Retained Plaintiffs' Tips in Violation of the FLSA**

29.     At all times material, Defendant maintained control, oversight, and direction over the Plaintiffs, including the ability to hire, fire, and discipline them.

30.     At all times material, Defendant regularly employed two or more employees for the relevant time that handled goods or materials that travelled through interstate commerce, or used

instrumentalities of interstate commerce, thus making Defendant's business an enterprise covered under the Fair Labor Standards Act.

31.     At all times material, Defendant was an enterprise engaged in interstate commerce in the course of their marketing, preparation, cooking, service, and sale of foodstuffs, produce, meats, fish, beverages, coffees, teas, alcoholic beverages, and products that have moved through interstate commerce.

32.     At all times material, Defendant regularly and recurrently obtained, solicited, exchanged, and sent funds to and from outside of the State of Florida, used telephonic transmissions going outside of the State of Florida to conduct business, and transmitted electronic information through computers, the internet, via email, and otherwise outside of the State of Florida.

33.     At all times material, Defendant has had gross revenues in excess of $500,000 per year.

34.     At all times material, the Defendant was an "enterprise engaged in commerce or the production of goods for commerce," within the meaning of 29 § U.S.C. 206(a).

35.     At all times material, the Defendant had two or more "employees handling, selling or otherwise working on goods or material that have been moved in or produced for commerce by any person," within the meaning of 29 § U.S.C. 203(s)(1)(A).

36.     At all times material, the Defendant had an annual gross volume of sale made or business done of not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated), within the meaning of 29 § U.S.C. 203(s)(1)(A).

37.     As part of the Plaintiffs' employment, Defendants agreed to pay Plaintiffs an hourly rate, plus tips. Plaintiffs were paid approximately $12.00 per hour and regularly received tips exceeding the value of their hourly wage.

38.     During Plaintiffs' employment, Defendant allowed managers and supervisors to improperly and unlawfully retain service tips intended for the Plaintiffs, for valet services performed by the Plaintiffs.

39.     Defendant's managers and supervisors who improperly retained Plaintiffs' service tips, included but were not limited to: Belfond; Alexis Freud ("Freud"), an individual Black Haitian male; Joseph Clotaire ("Clotaire"), an individual Black Haitian male; and Ronald Orisma ("Orisma") an individual Black Haitian male.

40.     Freud, Clotaire, and Orisma are referred to collectively hereinafter as "Ramp Supervisors."

41.     At all times material, the Ramp Supervisors asserted supervisory authority over Plaintiffs, including the power to hire, fire, demote, and/or promote Plaintiffs.

42.     At all times material, the Ramp Supervisors asserted supervisory authority over all Setai valet runners and had operational control over all Setai valet runners.

43.     At all times material, the Ramp Supervisors' primary duties were the management of Defendant's business and the management of Defendant's valet service.

44.     Plaintiffs noticed that Belfond and the Ramp Supervisors did not retain the tips extended to non-Hispanic valets and that the Defendant's targeting of them was on account of their race.

45.     Patrons often left cash tips for Plaintiffs in the care of Belfond or the Ramp Supervisors, expecting that the tips would be properly paid out. Plaintiffs became aware of these

tips when patrons informed them that they had left a tip for the Plaintiffs, or when they visually observed the patrons leaving the tips with one of these employees.

46.     On these occasions, Plaintiffs would approach Belfond or whatever other relevant employee and attempt to collect their tip. In response, Plaintiffs were told that the patron had left no tip for them, or, alternatively, they were paid only a portion of the total tip amount.

47.     Belfond and the Ramp Supervisors often sent Plaintiffs on back-to-back valet trips consisting of the drop-off of one vehicle and the retrieval of another. Upon their return, Plaintiffs were falsely informed that no tip had been left them.

48.     Belfond and the Ramp Supervisors would also go out of their way to retrieve vehicles for patrons who were known to tip generously. Belfond and the Ramp Supervisors did so in an attempt to unlawfully divert tips away from the Plaintiffs and keep the tips for themselves.

49.     During the day shift, the Valet Runners, which included the Plaintiffs, were required to collectively pool their cash tips. Each Valet Runner placed any tip received during the shift into a pool box, with the tips being evenly distributed to each employee at the end of the shift.

50.     Despite the fact that they were supervisory personnel, Belfond and the Ramp Supervisors improperly participated in the tip pool.

51.     In addition to the cash tips unlawfully retained by Defendant's supervisors and managers, during both the day shift and night shift, Defendant directly retained all credit card tips paid to the Plaintiffs, for services performed by the Plaintiffs.

52.     Defendant collected credit card tips from patrons using software known as Flash Valet.

53.     Patrons paid these tips believing that they would be distributed to the Valet Runners. Instead, Defendant unlawfully retained all credit card tips collected from the patrons.

54.     At all times material, Defendant failed to properly distribute the tips paid by patrons to the Plaintiffs and unlawfully retained the tips, in violation of the FLSA.

55.     Since the value of the tips received by the Plaintiffs regularly exceeded the value of their hourly wage, the Defendant's unlawful retention and/or distribution of tips had a significant and material negative impact on the wages that the Plaintiffs earned, often resulting in the Plaintiffs losing thousands of dollars in tips per week.

56.     At all times material, Defendant allowed Belfond, Ramp Supervisors, and other traditionally non-tipped employees, to improperly participate in the tip pool and/or keep a portion of the tips earned by Plaintiffs, in violation of the FLSA.

57.     At all times material, Defendant willfully and intentionally refused to pay Plaintiffs the tips they earned for work performed.

58.     At all times material, Defendant either knew from prior experience or recklessly failed to investigate whether its failure to pay Plaintiffs all of the tips they earned and/or that patrons left for their benefit violated the FLSA, and then it failed to timely correct its violation(s).

59.     Plaintiffs are entitled to payment of all tips that Defendant was required to pay to Plaintiffs, that Defendant improperly retained, and/or that Defendant improperly distributed to traditionally non-tipped employees, such as managers and supervisors, and an additional equal amount in the form of liquidated damages.

### Defendant Unlawfully Discriminated Against Plaintiffs on the Basis of Their Race

60.     At all times material, Belfond, Ramp Supervisors, and Natasha Pierre ("Pierre"), an individual Black Haitian female who was employed by Defendant as a Cashier, operated the valet service in a discriminatory manner by favoring Black Haitian valet employees in the assignment of vehicle retrievals.

8

61.     Black Haitian valet employees were similarly situated to the Plaintiffs in all material respects, including but not limited to, in their respective job titles, job duties, supervisors, and employment policies.

62.     By means of example, Belfond and Pierre routinely assigned more generously tipping patrons to Black Haitian employees and assigned patrons with a reputation for giving low and/or no tips, to the Plaintiffs.

63.     Belfond and Pierre would also deliberately send Plaintiffs to retrieve the wrong car in an effort to divert tips to non-Hispanic employees. Plaintiffs were often assigned vehicle retrievals and "inadvertently" given the wrong set of keys. Upon Plaintiffs' return from retrieving the incorrect vehicle, they were then ordered immediately either to repark the wrong car or to go to the front of the hotel allegedly to park a new arrival. Meanwhile, a Black Haitian valet was sent to retrieve the right car and thus acquire the tip for such job.

64.     On or around May 28, 2022, Mr. De La Rosa, complained to Pierre, in the presence of Belfond, about the preferential retrieval assignments she consistently handed to non-Hispanic valets and the disparate treatment of the Hispanic valets generally. Pierre responded, "If you think you are gonna get me fired, I am gonna get *you* fired."

65.     At all times material, Defendant assigned a more burdensome workload to Plaintiffs than their non-Hispanic co-workers and gave preferential treatment to their non-Hispanic co-workers.

66.     By means of example, Belfond permitted non-Hispanic valets to show up late to work or call out of work as often as they liked without being subject to discipline. In stark contrast, on one occasion, when Mr. De La Rosa called out of a work shift for good cause, he was told he would be terminated if he ever called out again.

67.     Belfond also allowed Black Haitian valets – who, like the rest of the valets, typically worked outdoors – to enter the valet office and stay there for as long as they wanted.

68.     In the valet office non-Hispanic valets, while on the clock, were free to sit, to cool off in the air-conditioning, to drink water, to use their telephones, and even to browse the internet using Belfond's computer.

69.     Plaintiffs, on the other hand, were not allowed to enter the valet office because they were Hispanic.

70.     While non-Hispanic valets were permitted to take breaks lasting one hour or more, the Plaintiffs were normally not allowed breaks exceeding ten (10) minutes in duration. In fact, Belfond often prohibited Plaintiffs from taking breaks altogether.

71.     Plaintiffs were also disadvantaged on the basis of their race in that they were not allowed to use the service elevators even though non-Hispanic valets were allowed to use them. Plaintiffs were thus required to use the stairs at all times.

72.     In or around March 2022, Mr. De La Rosa accidentally slipped and twisted his right ankle in the course of employment while he climbed down several flights of stairs after parking a vehicle and being rushed down to park another one.

73.     At all times material, Mr. Feliz Mateo, for his part, suffered chronic spinal cord injury. Due to the restrictions imposed on him and the other Plaintiffs concerning the use of the service elevators, Mr. Feliz Mateo's condition was aggravated.

74.     At all times material, Plaintiffs were subjected to harsh scrutiny and criticism by their supervisors. By means of example, when retrieving a vehicle, Plaintiffs were radioed by Belfond or the Ramp Supervisors who would repeatedly rush and badger them to complete the retrieval, displaying no regard for Plaintiffs' safety while they drove.

75.     In contrast, Belfond and the Ramp Supervisors allowed non-Haitian valets to take their time while retrieving vehicles and did not subject them to the same hostility displayed towards the Plaintiffs.

76.     Defendant's mistreatment of the Plaintiffs was not limited to verbal harassment alone. By means of example, on or around May 28, 2022, Mr. Gutierrez, while speaking with a prospective patron regarding the price of valet parking in Spanish, was physically assaulted by Belfond. During the conversation, Belfond approached Mr. Gutierrez and forcefully shoved him.

77.     Mr. Gutierrez was extremely humiliated and embarrassed by his supervisor's assault. When Gutierrez asked Belfond why he had shoved him, Belfond laughed and replied, "You were too close to the guest."

78.     Mr. Gutierrez later realized that Belfond had pushed him because he was irritated at Mr. Gutierrez for speaking to a prospective patron in Spanish.

**Defendant Discriminated Against Plaintiff Feliz Mateo on the Basis of His Color and Sex**

79.     In addition to the race-based discrimination perpetrated against all Plaintiffs by valet services employees, Mr. Feliz Mateo was also subjected to color-based discrimination and sex-based discrimination.

80.     Defendant's discrimination of Mr. Feliz Mateo initially began in or around October of 2021. By means of example, Mr. Feliz Mateo, who has a dark-skinned complexion, was regularly subjected to racial slurs during his employment. Emilio (last name unknown) ("Emilio"), an individual male employed by Defendant as a Bellman, routinely called Mr. Feliz Mateo "negro," a Spanish racial epithet that translates as "nigger."

81.     Emilio is a fair-skinned Hispanic male and used the slur to disparage Mr. Feliz

Mateo's dark complexion. Emilio often called Mr. Feliz Mateo "negro" out loud in the presence

of other coworkers and the public.

82.     Emilio also routinely called Mr. Feliz Mateo "thief" out loud in the presence of

other coworkers and the public. On at least one occasion, Emilio called Mr. Feliz Mateo, "negro

ladrón," a Spanish term that translates to "thieving nigger."

83.     Several bellmen, including Emilio, Javier (last name unknown) ("Javier"), Eric

(last name unknown) ("Eric"), and Pablo (last name unknown) ("Pablo"), collectively referred to

as the "Bellmen" hereafter, routinely called Mr. Feliz Mateo "gay" and "maricon," a Spanish term

that translates to "faggot."

84.     Javier and Eric spread false rumors among Defendant's employees and patrons that

Mr. Feliz Mateo was engaged in a sexual relationship with a male resident of Setai's residential

tower.

85.     Mr. Feliz Mateo repeatedly asked the Bellmen to stop their discriminatory

harassment of him to no avail.

86.     On or around April 2022, Mr. Feliz Mateo complained to bell services manager,

Enrique Carpio, an individual male employed by Defendant as Bell Services Manager ("Carpio"),

about the discrimination he was experiencing at the hands of the Bellmen.

87.     Carpio failed to take corrective action towards the Bellmen and Mr. Feliz Mateo

continued to be subjected to the discriminatory treatment.

88.     On or around May 5, 2022, Mr. Feliz Mateo complained again to Carpio about the

repeated discrimination and verbal abuse that he was experiencing at the hands of the bellmen. In

response, Carpio said, "Setai has no [human resources] office."

**Defendant Failed to Take Corrective Action in Response to Plaintiffs' Complaints**

89.     Mr. De La Rosa, Mr. Feliz Mateo, and Mr. Gutierrez repeatedly complained about the discriminatory treatment they experienced to Defendant, including but not limited Plaintiffs' supervisor, Belfond, Defendant's security personnel, Defendant's human resources representatives, and several other employees.

90.     By means of example, in or around February 2022, Mr. De La Rosa complained about the discriminatory treatment that the Hispanic valets were experiencing to Eileen Aguilar ("Aguilar"), an individual female employed by Defendant as a human resources representative. Agular failed to take any corrective action.

91.     Similarly, Mr. De La Rosa complained to Cynthia Abugattas ("Abugattas"), an individual female employed by Defendant as a human resources representative, in May of 2022 and in June of 2022. Abugattas failed to take any corrective action.

92.     In or around July 2022, Mr. Gutierrez also reported the discriminatory treatment that the Hispanic valets were experiencing to Abugattas. Mr. Gutierrez reported Defendant's unlawful theft of tips, Defendant's preferential assignment of vehicle retrievals, Defendant's harsh scrutiny towards the Hispanic valets, and the physical assault committed by Belfond.

93.     Setai's general manager, Alex Furrer ("Furrer"), an individual male employed by Defendant as General Manager, was also present at the meeting between Mr. Gutierrez and Abugattas.

94.     Neither Furrer nor Abugattas took any meaningful corrective action in response to Mr. Gutierrez's complaints of unlawful discrimination and harassment.

95.     Plaintiffs realized that no meaningful corrective action was being taken in response to their complaints. Plaintiffs were left with no choice but to resign from their positions with Defendant.

96.     On or around June 6, 2022, Defendant constructively terminated Mr. De La Rosa.

97.     On or around July 15, 2022, Defendant constructively terminated Mr. Gutierrez.

98.     On or around July 29, 2022, Defendant constructively terminated Mr. Feliz Mateo.

99.     Defendant made Plaintiffs' working conditions so onerous, abusive, and intolerable that no employee in their shoes would have reasonably been expected to continue working for Defendant, such that Plaintiffs' resignation was devoid of choice or free will.

100.    The above-described conduct represents just some examples of the unlawful discrimination and harassment to which Defendant subjected Plaintiffs.

101.    Defendant unlawfully discriminated against Plaintiffs on the basis of their race.

102.    Defendant unlawfully discriminated against Mr. Feliz Mateo on the basis of his race, color, and sex.

103.    Plaintiffs claim a continuous practice of discrimination and make all claims herein under the continuing violations doctrine.

104.    Defendant is either directly or vicariously responsible for the unlawful acts and conduct complained of herein.

105.    As a result of Defendant's actions, Plaintiffs felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

106.    At all times material, Defendant's employees acted as agents of Defendant in their discriminatory and unlawful treatment of Plaintiffs.

107.    At all times material, Defendant acted with deliberate indifference to the discriminatory treatment and hostile work environment complained of herein.

108.    As a result of the acts and conduct complained herein, Plaintiffs have suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiffs have also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiffs have further experienced severe emotional and physical distress.

109.    Defendant's conduct was malicious, willful, extreme, and outrageous, and conducted with full knowledge of the law so as to justify an award of punitive damages against Defendant.

**CAUSES OF ACTION**
**COUNT I**
**42 U.S.C. § 1981**
**RACE DISCRIMINATION**
**(Plaintiff De La Rosa as Against Defendant)**

110.    Mr. De La Rosa reincorporates the factual allegations in Paragraphs 19 through 109.

111.    Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

112.     Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

113.     Mr. De La Rosa is a person of Hispanic race and is therefore a protected class member.

114.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

115.     Defendant subjected Mr. De La Rosa to discriminatory treatment on the basis of his race.

116.     The Defendant's discriminatory treatment included, but was not limited to, unlawfully retaining tips earned by Mr. De La Rosa; giving preferential treatment to Mr. De La Rosa's non-Hispanic co-workers in the assignment of vehicle retrievals; denying Mr. De La Rosa the same employment privileges afforded to his non-Hispanic co-workers (including the denial of use of facilities, such as the service elevators, and the denial of benefits, such as taking breaks during shifts); and unlawfully terminating Mr. De La Rosa, among others.

117.     Defendant targeted Mr. De La Rosa because he was a person of Hispanic race. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. De La Rosa was forced to endure.

118.     The discriminatory actions of the Defendant against Mr. De La Rosa, as described and set forth above, constitute an adverse employment action for purposes of Section 1981. In subjecting Mr. De La Rosa to adverse employment actions, the Defendant intentionally discriminated against Mr. De La Rosa with respect to the compensation, terms, conditions, or privileges of his employment.

119.    As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. De La Rosa has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. De La Rosa has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

120.    Mr. De La Rosa accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

121.    The Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. De La Rosa's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

122.    Defendant's conduct deprived Mr. De La Rosa of his statutory rights guaranteed under Section 1981.

123.    Mr. De La Rosa further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT II**
**42 U.S.C. § 1981**
**HOSTILE WORK ENVIRONMENT**
**(Plaintiff De La Rosa as Against Defendant)**

124.    Mr. De La Rosa reincorporates the factual allegations in Paragraphs 19 through 109.

125.    Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like

17

punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

126.    Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

127.    Mr. De La Rosa is a person of Hispanic race and is therefore a protected class member.

128.    The Defendant's discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

129.    The Defendant's severe and pervasive conduct included, but was not limited to, unlawfully retaining tips earned by Mr. De La Rosa; giving preferential treatment to Mr. De La Rosa's non-Hispanic co-workers in the assignment of vehicle retrievals; subjecting Mr. De La Rosa to harsher scrutiny and discipline than his non-Hispanic co-workers; and denying Mr. De La Rosa the same employment privileges afforded to his non-Hispanic co-workers (including the denial of use of facilities, such as the service elevators, and the denial of benefits, such as taking breaks during shifts), among others.

130.    Defendant targeted Mr. De La Rosa because he is a person of Hispanic race. No similarly situated employee outside his protected classes endured the discriminatory conduct that Mr. De La Rosa was forced to endure.

131.    The Defendant's discriminatory conduct toward Mr. De La Rosa negatively impacted both his professional life and his personal life. The Defendant's conduct made Mr. De La Rosa feel isolated, humiliated, embarrassed, and ashamed.

132.    As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. De La Rosa has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. De La Rosa has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

133.    Mr. De La Rosa accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

134.    The Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. De La Rosa's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

135.    Defendant's conduct deprived Mr. De La Rosa of his statutory rights guaranteed under Section 1981.

136.    Mr. De La Rosa further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT III**
**42 U.S.C. § 1981**
**RACE AND COLOR DISCRIMINATION**
**(Plaintiff Feliz Mateo as Against Defendant)**

137.    Mr. Feliz Mateo reincorporates the factual allegations in Paragraphs 19 through 109.

138.    Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like

punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

139.    Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

140.    Mr. Feliz Mateo is a person of Hispanic race and a dark-skinned person, and he is therefore a protected class member.

141.    The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

142.    Defendant subjected Mr. Feliz Mateo to discriminatory treatment on the basis of his race and skin color.

143.    The Defendant's discriminatory treatment included, but was not limited to, unlawfully retaining tips earned by Mr. Feliz Mateo; giving preferential treatment to Mr. Feliz Mateo's non-Hispanic co-workers in the assignment of vehicle retrievals; denying Mr. Feliz Mateo the same employment privileges afforded to his non-Hispanic co-workers (including the denial of use of facilities, such as the service elevators, and the denial of benefits, such as taking breaks during shifts); and unlawfully terminating Mr. Feliz Mateo, among others.

144.    Defendant targeted Mr. Feliz Mateo because he was a person of Hispanic race and a dark-skinned person. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. Feliz Mateo was forced to endure.

145.    The discriminatory actions of the Defendant against Mr. Feliz Mateo, as described and set forth above, constitute an adverse employment action for purposes of Section 1981. In subjecting Mr. Feliz Mateo to adverse employment actions, the Defendant intentionally

discriminated against Mr. Feliz Mateo with respect to the compensation, terms, conditions, or privileges of his employment.

146.    As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. Feliz Mateo has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Feliz Mateo has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

147.    Mr. Feliz Mateo accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

148.    The Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Feliz Mateo's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

149.    Defendant's conduct deprived Mr. Feliz Mateo of his statutory rights guaranteed under Section 1981.

150.    Mr. Feliz Mateo further requests that his attorney's fees and costs be awarded as permitted by law.

<u>**COUNT IV**</u>
**42 U.S.C. § 1981**
**HOSTILE WORK ENVIRONMENT**
**(Plaintiff Feliz Mateo as Against Defendant)**

151.    Mr. Feliz Mateo reincorporates the factual allegations in Paragraphs 19 through 109.

152.    Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts,

21

to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

153.    Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

154.    Mr. Feliz Mateo is a person of Hispanic race and a dark-skinned person, and he is therefore a protected class member.

155.    The Defendant's discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

156.    The Defendant's severe and pervasive conduct included, but was not limited to, subjecting Mr. Feliz Mateo to the use of racial slurs including, "negro" ('nigger') and "negro ladrón" ('thieving nigger'); unlawfully retaining tips earned by Mr. Feliz Mateo; giving preferential treatment to Mr. Feliz Mateo's non-Hispanic co-workers in the assignment of vehicle retrievals; subjecting Mr. Feliz Mateo to harsher scrutiny and discipline than his non-Hispanic co-workers; and denying Mr. Feliz Mateo the same employment privileges afforded to his non-Hispanic co-workers (including the denial of use of facilities, such as the service elevators, and the denial of benefits, such as taking breaks during shifts), among others.

157.    Defendant targeted Mr. Feliz Mateo because he is a person of Hispanic race and a dark-skinned person. No similarly situated employee outside his protected classes endured the discriminatory conduct that Mr. Feliz Mateo was forced to endure.

158.     The Defendant's discriminatory conduct toward Mr. Feliz Mateo negatively impacted both his professional life and his personal life. The Defendant's conduct made Mr. Feliz Mateo feel isolated, humiliated, embarrassed, and ashamed.

159.     As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. Feliz Mateo has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

160.     Mr. Feliz Mateo has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

161.     Mr. Feliz Mateo accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

162.     The Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Feliz Mateo's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

163.     Defendant's conduct deprived Mr. Feliz Mateo of his statutory rights guaranteed under Section 1981.

164.     Mr. Feliz Mateo further requests that his attorney's fees and costs be awarded as permitted by law.

## COUNT V
### 42 U.S.C. § 1981
### RACE DISCRIMINATION
### (Plaintiff Gutierrez as Against Defendant)

165.     Mr. Gutierrez reincorporates the factual allegations in Paragraphs 19 through 109.

166.     Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts,

to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

167.    Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

168.    Mr. Gutierrez is a person of Hispanic race and is therefore a protected class member.

169.    The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

170.    Defendant subjected Mr. Gutierrez to discriminatory treatment on the basis of his race.

171.    The Defendant's discriminatory treatment included, but was not limited to, unlawfully retaining tips earned by Mr. Gutierrez; giving preferential treatment to Mr. Gutierrez's non-Hispanic co-workers in the assignment of vehicle retrievals; denying Mr. Gutierrez the same employment privileges afforded to his non-Hispanic co-workers (including the denial of use of facilities, such as the service elevators, and the denial of benefits, such as taking breaks during shifts); and unlawfully terminating Mr. Gutierrez, among others.

172.    Defendant targeted Mr. Gutierrez because he was a person of Hispanic race. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. Gutierrez was forced to endure.

173.    The discriminatory actions of the Defendant against Mr. Gutierrez, as described and set forth above, constitute an adverse employment action for purposes of Section 1981. In subjecting Mr. Gutierrez to adverse employment actions, the Defendant intentionally discriminated against Mr. Gutierrez with respect to the compensation, terms, conditions, or privileges of his employment.

174.    As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. Gutierrez has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Gutierrez has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

175.    Mr. Gutierrez accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

176.    The Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Gutierrez's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

177.    Defendant's conduct deprived Mr. Gutierrez of his statutory rights guaranteed under Section 1981.

178.    Mr. Gutierrez further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT VI**
**42 U.S.C. § 1981**
**HOSTILE WORK ENVIRONMENT**
**(Plaintiff Gutierrez as Against Defendant)**

179.    Mr. Gutierrez reincorporates the factual allegations in Paragraphs 19 through 109.

180.    Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

181.    Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

182.    Mr. Gutierrez is a person of Hispanic race and is therefore a protected class member.

183.    The Defendant's discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

184.    The Defendant's severe and pervasive conduct included, but was not limited to, physically assaulting Mr. Gutierrez; unlawfully retaining tips earned by Mr. Gutierrez; giving preferential treatment to Mr. Gutierrez's non-Hispanic co-workers in the assignment of vehicle retrievals; subjecting Mr. Gutierrez to harsher scrutiny and discipline than his non-Hispanic co-workers; and denying Mr. Gutierrez the same employment privileges afforded to his non-Hispanic co-workers (including the denial of use of facilities, such as the service elevators, and the denial of benefits, such as taking breaks during shifts), among others.

185.     Defendant targeted Mr. Gutierrez because he is a person of Hispanic race. No similarly situated employee outside his protected classes endured the discriminatory conduct that Mr. Gutierrez was forced to endure.

186.     The Defendant's discriminatory conduct toward Mr. Gutierrez negatively impacted both his professional life and his personal life. The Defendant's conduct made Mr. Gutierrez feel isolated, humiliated, embarrassed, and ashamed.

187.     As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Section 1981, Mr. Gutierrez has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Gutierrez has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

188.     Mr. Gutierrez accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

189.     The Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Gutierrez's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

190.     Defendant's conduct deprived Mr. Gutierrez of his statutory rights guaranteed under Section 1981.

191.     Mr. Gutierrez further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT VII**
**42 U.S.C. § 2000e-2**
**SEX DISCRIMINATION**
**(Plaintiff Feliz Mateo as Against Defendant)**

192.     Mr. Feliz Mateo reincorporates the factual allegations in Paragraphs 19 through 109.

193.     Title VII provides in relevant part, that "it shall be an unlawful employment practice for an employer… to discrimination against any individual with respect to his compensation, term, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

194.     Title VII further providers that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

195.     Mr. Feliz Mateo is an individual male and is therefore a protected class member.

196.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

197.     Defendant subjected Mr. Feliz Mateo to discriminatory treatment on the basis of his sex.

198.     The Defendant's discriminatory treatment included, but was not limited to, subjecting Mr. Feliz Mateo to sexist and demeaning verbal abuse on the basis of his sexual orientation, including the use of slurs such as "gay" and "faggot"; spreading false rumors about Mr. Feliz Mateo's sexual activity; and unlawfully terminating Mr. Feliz Mateo, among others.

199.    Defendant targeted Mr. Feliz Mateo because he is a man perceived by Defendant to be effeminate or sexually attracted to his own sex. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. Feliz Mateo was forced to endure.

200.    The discriminatory actions of the Defendant against Mr. Feliz Mateo, as described and set forth above, constitute an adverse employment action for purposes of Title VII. In subjecting Mr. Feliz Mateo to adverse employment actions, the Defendant intentionally discriminated against Mr. Feliz Mateo with respect to the compensation, terms, conditions, or privileges of his employment.

201.    As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Title VII, Mr. Feliz Mateo has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Feliz Mateo has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

202.    Mr. Feliz Mateo accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

203.    The Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Feliz Mateo's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

204.    Defendant's conduct deprived Mr. Feliz Mateo of his statutory rights guaranteed under Title VII.

205.    Mr. Feliz Mateo further requests that his attorney's fees and costs be awarded as permitted by law.

29

## COUNT VIII
### 42 U.S.C. § 2000e-2
### HOSTILE WORK ENVIRONMENT
### (Plaintiff Feliz Mateo as Against Defendant)

206.    Mr. Feliz Mateo reincorporates the factual allegations in Paragraphs 19 through 109.

207.    Title VII provides in relevant part, that "it shall be an unlawful employment practice for an employer… to discrimination against any individual with respect to his compensation, term, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

208.    Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

209.    Mr. Feliz Mateo is an individual male and is therefore a protected class member.

210.    The Defendant's discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

211.    The Defendant's severe and pervasive conduct included, but was not limited to, subjecting Mr. Feliz Mateo to sexist and demeaning verbal abuse on the basis of his sexual orientation, including the use of slurs such as "gay" and "faggot"; spreading false rumors about Mr. Feliz Mateo's sexual activity; and unlawfully terminating Mr. Feliz Mateo, among others.

212.    Defendant targeted Mr. Feliz Mateo because he is a man perceived by Defendant to be effeminate or sexually attracted to his own sex. No similarly situated employee outside his protected class endured the discriminatory conduct that Mr. Feliz Mateo was forced to endure.

213. The Defendant's discriminatory conduct toward Mr. Feliz Mateo negatively impacted both his professional life and his personal life. The Defendant's conduct made Mr. Feliz Mateo feel isolated, humiliated, embarrassed, and ashamed.

214. As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Title VII, Mr. Feliz Mateo has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Mr. Feliz Mateo has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

215. Mr. Feliz Mateo accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

216. The Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Mr. Feliz Mateo's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

217. Defendant's conduct deprived Mr. Feliz Mateo of his statutory rights guaranteed under the Title VII.

218. Mr. Feliz Mateo further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT IX**
**29 U.S.C. § 203(m)**
**VIOLATION OF THE FLSA**
**(Plaintiff De La Rosa as Against Defendant)**

219. Mr. De La Rosa reincorporates the factual allegations in Paragraphs 19 through 109.

31

220.   Defendant was Mr. De La Rosa's employer for purposes of the FLSA, as the term "employer" is defined by 29 U.S.C. § 203(d).

221.   Under 29 U.S.C. § 203, an employer "may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips. . ." 29 U.S.C. § 203(m)(2)(B).

222.   At all times material, Belfond willfully retained tips left in his care by patrons to be distributed to Mr. De La Rosa, and willfully retained a share of the valet tip pool.

223.   At all times material, Belfond, Ramp Supervisors, and other traditionally non-tipped employees willfully retained tips left in their care by patrons to be distributed to Mr. De La Rosa, and willfully retained a share of the valet tip pool.

224.   At all times material, Defendant allowed Belfond, Ramp Supervisors, and other traditionally non-tipped employees, such as managers and supervisors, to improperly participate in the tip pool and/or keep a portion of the tips earned by Plaintiffs, in violation of the FLSA.

225.   Additionally, at all times material, Defendant disregarded the FLSA's prohibition on retaining tips earned by its valets by failing to distribute the tips paid by patrons to Mr. De La Rosa when such patrons paid the valet fee electronically.

226.   As a direct and proximate result of Defendant's retaining a portion of the tips earned or received by Mr. De La Rosa and/or distributing a portion of the tips to traditionally non-tipped employees, such as managers and supervisors, Defendant violated the FLSA.

227.   Pursuant to 29 U.S.C. § 216(b), Mr. De La Rosa is entitled to payment of all tips that Defendant was required to pay to Mr. De La Rosa, that Defendant improperly retained, and/or that Defendant improperly distributed to traditionally non-tipped employees, such as managers and supervisors, and an additional equal amount in the form of liquidated damages.

228.    Defendant willfully and intentionally refused to pay Plaintiff all the tips they earned or received during the relevant time.

229.    Defendant either knew from prior experience or recklessly failed to investigate whether its failure to pay Mr. De La Rosa all of the tips he earned and/or that patrons left for his benefit, violated the FLSA, and then it failed to timely correct its violation(s).

230.    The employment records for Mr. De La Rosa from which the Defendant's liability can be ascertained are within the exclusive custody and control of the Defendant.

231.    At this time, the total amounts are unknown and are to be determined upon further investigation.

232.    Mr. De La Rosa further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT X**
**29 U.S.C. § 203(m)**
**VIOLATION OF THE FLSA**
**(Plaintiff Feliz Mateo as Against Defendant)**

233.    Mr. Feliz Mateo reincorporates the factual allegations in Paragraphs 19 through 109.

234.    Defendant was Mr. Feliz Mateo's employer for purposes of the FLSA, as the term "employer" is defined by 29 U.S.C. § 203(d).

235.    Under 29 U.S.C. § 203, an employer "may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips. . ." 29 U.S.C. § 203(m)(2)(B).

236.    At all times material, Belfond willfully retained tips left in his care by patrons to be distributed to Mr. Feliz Mateo, and willfully retained a share of the valet tip pool.

237.     At all times material, Belfond, Ramp Supervisors, and other traditionally non-tipped employees willfully retained tips left in their care by patrons to be distributed to Mr. Feliz Mateo, and willfully retained a share of the valet tip pool.

238.     At all times material, Defendant allowed Belfond, Ramp Supervisors, and other traditionally non-tipped employees, such as managers and supervisors, to improperly participate in the tip pool and/or keep a portion of the tips earned by Plaintiffs, in violation of the FLSA.

239.     Additionally, at all times material, Defendant disregarded the FLSA's prohibition on retaining tips earned by its valets by failing to distribute the tips paid by patrons to Mr. Feliz Mateo when such patrons paid the valet fee electronically.

240.     As a direct and proximate result of Defendant's retaining a portion of the tips earned or received by Mr. Feliz Mateo and/or distributing a portion of the tips to traditionally non-tipped employees, such as managers and supervisors, Defendant violated the FLSA.

241.     Pursuant to 29 U.S.C. § 216(b), Mr. Feliz Mateo is entitled to payment of all tips that Defendant was required to pay to Mr. Feliz Mateo, that Defendant improperly retained, and/or that Defendant improperly distributed to traditionally non-tipped employees, such as managers and supervisors, and an additional equal amount in the form of liquidated damages.

242.     Defendant willfully and intentionally refused to pay Plaintiff all the tips they earned or received during the relevant time.

243.     Defendant either knew from prior experience or recklessly failed to investigate whether its failure to pay Mr. Feliz Mateo all of the tips he earned and/or that patrons left for his benefit, violated the FLSA, and then it failed to timely correct its violation(s).

244.     The employment records for Mr. Feliz Mateo from which the Defendant's liability can be ascertained are within the exclusive custody and control of the Defendant.

245.     At this time, the total amounts are unknown and are to be determined upon further investigation.

246.     Mr. Feliz Mateo further requests that his attorney's fees and costs be awarded as permitted by law.

**<u>COUNT XI</u>**
**29 U.S.C. § 203(m)**
**VIOLATION OF THE FLSA**
**(Plaintiff Gutierrez as Against Defendant)**

247.     Mr. Gutierrez reincorporates the factual allegations in Paragraphs 19 through 109.

248.     Defendant was Mr. Gutierrez's employer for purposes of the FLSA, as the term "employer" is defined by 29 U.S.C. § 203(d).

249.     Under 29 U.S.C. § 203, an employer "may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips. . ." 29 U.S.C. § 203(m)(2)(B).

250.     At all times material, Belfond willfully retained tips left in his care by patrons to be distributed to Mr. Gutierrez, and willfully retained a share of the valet tip pool.

251.     On multiple occasions, Belfond, Ramp Supervisors, and other traditionally non-tipped employees willfully retained tips left in their care by patrons to be distributed to Mr. Gutierrez, and willfully retained a share of the valet tip pool.

252.     At all times material, Defendant allowed Belfond, Ramp Supervisors, and other traditionally non-tipped employees, such as managers and supervisors, to improperly participate in the tip pool and/or keep a portion of the tips earned by Plaintiffs, in violation of the FLSA.

253.     Additionally, at all times material, Defendant disregarded the FLSA's prohibition on retaining tips earned by its valets by failing to distribute the tips paid by patrons to Mr. Gutierrez when such patrons paid the valet fee electronically.

254.    As a direct and proximate result of Defendant's retaining a portion of the tips earned or received by Mr. Gutierrez and/or distributing a portion of the tips to traditionally non-tipped employees, such as managers and supervisors, Defendant violated the FLSA.

255.    Pursuant to 29 U.S.C. § 216(b), Mr. Gutierrez is entitled to payment of all tips that Defendant was required to pay to Mr. Gutierrez, that Defendant improperly retained, and/or that Defendant improperly distributed to traditionally non-tipped employees, such as managers and supervisors, and an additional equal amount in the form of liquidated damages.

256.    Defendant willfully and intentionally refused to pay Plaintiff all the tips they earned or received during the relevant time.

257.    Defendant either knew from prior experience or recklessly failed to investigate whether its failure to pay Mr. Gutierrez all of the tips he earned and/or that patrons left for his benefit, violated the FLSA, and then it failed to timely correct its violation(s).

258.    The employment records for Mr. Gutierrez from which the Defendant's liability can be ascertained are within the exclusive custody and control of the Defendant.

259.    At this time, the total amounts are unknown and are to be determined upon further investigation.

260.    Mr. Gutierrez further requests that his attorney's fees and costs be awarded as permitted by law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request this Court enter judgment against the Defendant for all damages suffered by the Plaintiffs, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, emotional distress damages, punitive damages, interest, attorney's fees and costs,

disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as

a result of the Defendant's conduct in violation of Section 1981, Title VII, and the FLSA.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury as to all issues.


Dated:  Miami, Florida                        **DEREK SMITH LAW GROUP, PLLC**
        October 26, 2023,                      *Counsel for Plaintiffs*


                                               <u>*/s/ Kyle T. MacDonald*</u>
                                               Kyle T. MacDonald, Esq.
                                               Florida Bar No.: 1038749
                                               Derek Smith Law Group, PLLC
                                               520 Brickell Key Drive, Suite O-301
                                               Miami, FL 33131
                                               Tel: (305) 946-1884
                                               Fax: (305) 503-6741
                                               Kyle@dereksmithlaw.com